# Notice of Removal
# Exhibit 1

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

**LYNCHBURG RANGE & TRAINING, LLC**
**d/b/a SafeSide Lynchburg,**

**VIRGINIA CITIZENS DEFENSE LEAGUE,**

**GUN OWNERS OF AMERICA, INC.,**

**and**

**ASSOCIATION OF VIRGINIA GUN RANGES,**

|   |   |   |
|---|---|---|
| | **Plaintiffs,** | **Case No.** |

  **v.**

**HON. RALPH S. NORTHAM**
**(In his Official Capacity as**
**Governor of the Commonwealth of Virginia)**
**Capitol Square**
**Richmond, Virginia 23219**

**and**

**GARY T. SETTLE**
**(In his Official Capacity as**
**Superintendent of the Virginia State Police)**
**Virginia State Police**
**7700 Midlothian Turnpike**
**North Chesterfield, Virginia 23235,**

      **Defendants.**

## COMPLAINT, APPLICATION FOR TEMPORARY INJUNCTION, AND PETITION FOR WRIT OF MANDAMUS

### TABLE OF CONTENTS

Page

Jurisdiction and Venue.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Parties.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Summary of Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Argument

I.      Standard for Granting Temporary Injunction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.     EO 53 Constitutes an *Ultra Vires* Act of the Governor, in Violation of Virginia's Emergency Services and Disaster Law.. . . . . . . . . . . . . . . . . . . . . . . . 10

III.    The Executive Order Violates Rights Protected by Article I, Section 13 of the Virginia Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.     The Closure of Shooting Ranges Violates Rights of Virginians Recognized and Protected by the Second Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

V.      The Declaration of an Emergency Does Not Give the Government the Authority to Suspend Constitutionally Protected Rights. . . . . . . . . . . . . . . . . . . . 20

VI.     EO 53 Was Issued before and Is Inconsistent with the Federal Government's Designation of Shooting Ranges as Essential Critical Infrastructure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VII.    The Other Temporary Injunction Factors Weigh in Favor of Granting an Injunction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VIII.   A Writ of Mandamus Should Issue to Require Defendants to Cease and Desist from Enforcing the Governor's Ban on Indoor Shooting Ranges, and for the Governor to Notify the Public of the Rescission of the Application to Gun Ranges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Relief Sought. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

1

**COMPLAINT AND APPLICATION FOR TEMPORARY INJUNCTION**

COME NOW the Plaintiffs, Lynchburg Range & Training, LLC (d/b/a SafeSide Lynchburg), Virginia Citizens Defense League, Gun Owners of America, Inc., and Association of Virginia Gun Ranges, and move this Court for:

(1) a declaratory judgment finding that the provisions of Executive Order Number Fifty-Three issued by the Governor on March 23, 2020, which effected the complete and categorical closure of all indoor shooting ranges in the Commonwealth are:  (a) *ultra vires* and beyond the scope of the Governor's executive authority under the Constitution of Virginia, the Emergency Services and Disaster Law (Va. Code § 44.1-146.13, *et seq.*), and otherwise; (b) violative of Article I, § 13 of the Constitution of Virginia (Right to Keep and Bear Arms); (c) violative of the Second Amendment to the U.S. Constitution; and (d) violative of Article I, § 7 of the Constitution of Virginia (Anti-Suspension Provision);

(2) immediate entry of a temporary injunction, on an emergency basis, enjoining the Governor and the Superintendent of the Virginia State Police, and all law enforcement divisions, agencies, and officers within the Commonwealth, from enforcing, in any manner, the prohibition on operation of and public access to "indoor shooting ranges" as set forth in Paragraph 4 of Executive Order Number Fifty-Three issued by the Governor on March 23, 2020 ("EO 53"), provided that indoor shooting ranges shall operate in a manner consistent with Paragraph 7 of Executive Order Number Fifty-Three (*i.e.*, operate to the fullest extent possible in a manner consistent with social distancing and sanitizing guidance from federal and state authorities); and

(3) a writ of mandamus to enjoin enforcement of EO 53's closure of shooting ranges as well as notifying the public of the change, and

2

(4) such other and further relief as the Court may deem appropriate, and in support

thereof state as follows.

## JURISDICTION AND VENUE

1. This Court has jurisdiction to grant the relief sought pursuant to Va. Code § 8.01-184,

§ 8.01-620, and § 8.01-645.

2. Venue is proper and preferred in this Court pursuant to Va. Code § 8.01-261(15)(c),

§ 8.01-261(1)(a), and § 8.01-261(5), and is otherwise proper.

## PARTIES

3. Plaintiff Lynchburg Range & Training, LLC, d/b/a SafeSide Lynchburg (hereinafter

"LRT"), operates a commercial, indoor shooting range located at 2309 Mayflower Drive,

Lynchburg, Virginia 24501.  LRT opened to the public in October 2017, after making a multi-

million dollar investment into an indoor shooting range facility in Lynchburg.

4. Plaintiff Virginia Citizens Defense League ("VCDL") is a Virginia non-stock

corporation, with its principal place of business in Newington, Virginia.  VCDL is organized and

operated as a non-profit civic league that is exempt from federal income taxes under Section

501(c)(4) of the U.S. Internal Revenue Code.  VCDL has tens of thousands of members and

operates as a non-profit, non-partisan, grassroots organization dedicated to advancing the

fundamental human right of all Virginians to keep and bear arms as guaranteed by the Second

Amendment to the United States Constitution and Article I, § 13 of the Constitution of the

Commonwealth of Virginia.

5. Plaintiff Gun Owners of America, Inc. ("GOA") is a California non-stock corporation

with its principal place of business in Virginia, at 8001 Forbes Place, Suite 202, Springfield, VA

3

22151.  GOA has over 2 million members and supporters, including tens of thousands from the

Commonwealth of Virginia, and operates as a non-profit organization, exempt from federal

income taxes under Section 501(c)(4) of the Internal Revenue Code.  GOA's mission is to

preserve and defend the inherent Second Amendment rights of gun owners.

6.  Plaintiff Association of Virginia Gun Ranges ("AVGR") is a recently organized,

unincorporated association of gun ranges in Virginia which have joined together to protect the

interests of Virginia's gun ranges.  Its initial members include Safeside Range & Training in

Roanoke, Lynchburg Range & Training, LLC in Lynchburg, River City Range, LLC d/b/a

Colonial Shooting Academy in Richmond, and American Millennium Group d/b/a The

Marksman in Newport News.

7.  Defendant Ralph S. Northam is the Governor of the Commonwealth of Virginia

("Governor"), and is responsible for the promulgation of EO 53 that ordered closed all "indoor

shooting ranges," which is the subject of this Complaint, Application, and Petition.  Exhibit A.

Defendant Governor Northam subsequently issued Executive Order 55 (March 30, 2020) ("EO

55"), a temporary stay at home order, which imposes no separate impediment to Virginians

visiting gun ranges, were such ranges not forced to close under EO 53.  Exhibit B.

8.  Defendant Gary T. Settle is Superintendent of the Virginia State Police and is

responsible for oversight and enforcement of EO 53.

## PROCEDURAL BACKGROUND

9.  On March 23, 2020, Governor Northam issued Executive Order 53, which imposes

temporary restrictions on certain businesses, allegedly due to concerns about the spread of

COVID-19, based on a state of emergency which the Governor had previously declared in

4

Executive Order 51 (March 12, 2020).  Paragraph 4 of EO 53 mandates the "[c]losure of all

public access to recreational and entertainment businesses" from March 24, 2020 to April 23,

2020.  EO 53 applies expressly to theaters, museums, and other businesses which may be

reasonably described as "recreational and entertainment," including "indoor shooting ranges"

which, as discussed below, cannot properly be placed in that category.  Indeed, the subsection of

EO 53 closing these ranges categorizes them along with other businesses that it describes as

"places of indoor public amusement."

10.  As a direct result of Section 4 of EO 53, as currently enforced, gun ranges, including

Plaintiff LRT and the members of Plaintiff AVGR, have been required to close to the public.

11.  Defendant Virginia State Police ("VSP") issued News Release No. 4 (Apr. 1, 2020),

making clear that "[p]ersistent violation of" EO 53 and EO 55 directives "can result in an

individual(s) or business being charged with a class one misdemeanor, which carries up to a year

in jail and $2,500 fine."  Further, the VSP release states:  "State police is required to uphold the

laws of the Commonwealth and will continue to have a visible presence within our communities

and on the roads for the safety of those living, working and traveling in Virginia."  Exhibit C.

12.  On Friday, March 27, 2020, Plaintiff VCDL, by counsel, sent a letter to Governor

Northam, explaining its view that EO 53's closing of "indoor shooting ranges":  (i) violates the

Virginia Emergency Services and Disaster Law, Virginia Code § 44-1.146.13, *et seq*.; (ii)

violates Article I, Section 13 of the Virginia Constitution; (iii) violates the Second Amendment

to the United States Constitution; (iv) conflicts with the opposite rulings of the U.S. Court of

Appeals for the Seventh Circuit in two cases determining that gun ranges were protected under

the Second Amendment; (v) violates the ability of the unorganized militia to train; (vi) makes it

5

nearly impossible for many gun owners to obtain necessary practice with their firearms; and (vii) makes it nearly impossible for many new gun owners to obtain important safety and operational training in the use of their firearms.  Plaintiff VCDL's letter also explained the sophisticated ventilation and filtration systems used in indoor shooting ranges, reducing the risk of exposure to lead and other airborne contaminants.  Exhibit D.

13.  Plaintiff VCDL received emailed confirmation that its letter of March 27, 2020 was received by the Governor's office, but no other response to this letter has been received.

14.  On Saturday, March 28, 2020, the Director of the Cybersecurity and Infrastructure Security Agency ("CISA"), U.S. Department of Homeland Security ("DHS") issued an update to its "Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response, Version 2.0 (March 28, 2020)," in the form of a Memorandum entitled "Advisory Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response."  Exhibit E.  In the section of that Guidance on Law Enforcement, Public Safety, and Other First Responders, the Director of CISA designated the Firearms Industry — including shooting ranges — as part of the nation's Critical Infrastructure:

> Workers supporting the operation of firearm or ammunition product manufacturers, retailers, importers, distributors, **and shooting ranges**.  [Emphasis added.]

15.  On Monday, March 30, 2020, Plaintiff VCDL, by counsel, sent a second letter to Governor Northam, advising him of the update that CISA made concerning shooting ranges, and asking him to reconsider closure of indoor shooting ranges in light of the newly revised, official

6

position of the U.S. Department of Homeland Security, and to reverse that portion of EO 53. Exhibit F.

16.  Plaintiff VCDL asked for but obtained no confirmation that its letter of March 30, 2020 was received, and no substantive response has been received.

## FACTUAL BACKGROUND

17.  Plaintiff LRT operates a facility in Lynchburg with two components.  Part of the facility is a retail firearms store, offering sales, gunsmithing, and accessories.  The retail store portion of the facility is currently open and operating in accordance with the limitation on customers, distancing, and other requirements of EO 53.

18.  The other portion of Plaintiff LRT's facility is a three-bay indoor shooting range, consisting of 18 lanes that are 25-yards long (mostly for pistols), and four shooting lanes that are 112-yards long (mostly for rifles).  (The facility's 112-yard shooting lanes are the longest at any privately owned indoor facility east of the Mississippi River.)  Each lane is separated by bulletproof dividers.  The range has a million-dollar-plus state-of-the-art air ventilation/filtration system that is automatically monitored and computer-controlled by a "smart" system provided by Carey's Small Arms Ventilation, which causes a complete air exchange every 90 seconds, with HEPA filtration which cleans and scrubs 99.97 percent of contaminants in the air continuously. While the range is open, air is continuously channeled downrange, away from the shooters.

19.  Plaintiff LRT provides individual and group firearms training at its range, along with a concealed carry course.  The range offers annual and monthly memberships.  It has a special, lower-cost "Heroes" program for first responders, veterans, etc.  While the range has been shut down, the range has been required to lay off more than one-half of its staff and has suspended

7

monthly membership charges for the facility's use.  The range portion of the facility has been closed to the public since issuance of EO 53 by the Governor, but remains open only to serve law enforcement, pursuant to the provisions of EO 53.

20.  If the Governor were enjoined from enforcing EO 53 against Plaintiffs, then Plaintiff LRT would be allowed to reopen its range to the public, consistent with the other requirements of EO 53, hire back its staff, and provide a place for firearms training and practice.

21.  Plaintiff AVGR consists of members which operate sophisticated indoor shooting ranges similar to that of Plaintiff LRT, but have also been required to close to the public, lose revenue, and in some instances lay off employees.  *See* Affidavit of Mitchell Tyler.

22.  If the Governor were enjoined from enforcing EO 53 against indoor gun range members of AVGR, these ranges would be allowed to open up consistent with the other requirements of EO 53, hire back their staff, and provide a place for firearms training and practice.

23.  Plaintiff VCDL has tens of thousands of members and supporters all across the Commonwealth of Virginia, including within the jurisdiction of this Court, many of whom use indoor gun ranges in Virginia, and who want to continue to patronize those businesses, *inter alia*, in order to maintain their self-defense proficiency.

24.  Plaintiff GOA has tens of thousands of members and supporters all across the Commonwealth of Virginia, including within the jurisdiction of this Court, many of whom use indoor gun ranges in Virginia, and who want to continue to patronize those businesses, *inter alia*, in order to maintain their self-defense proficiency.

8

## SUMMARY OF ARGUMENT

25.  The issue presented in this case is narrow and discrete:  Whether the Governor of Virginia has the authority to order the complete closure of "indoor shooting ranges," as he did in Executive Order 53, issued March 23, 2020, which will be in effect to April 23, 2020 and, of course, could be extended thereafter.

26.  The Governor has no such power.  He is barred from closing shooting ranges under the Virginia "Emergency Services and Disaster Law."  But even more importantly, his closure order infringes on rights recognized and protected by Article I, § 13 of the Virginia Constitution and the Second Amendment of the United States Constitution.  It does not matter that the Governor has issued an emergency declaration or declared a state of emergency, as no elected official has the discretionary authority to suspend the protections the People wrote into their Constitution which also created the office in which the Governor serves.

27.  The text of EO 53 itself reveals a disrespect for the exercise of firearms-related rights.  It closes down indoor shooting ranges as mere "places of public amusement."  But although there is no enumerated right in the United States or Virginia constitutions to frequent a tanning salon, racetrack, or bowling alley, there is such a right recognized in both constitutions that protects shooting ranges.  Moreover, EO 53 allows businesses to remain open that are favored by the Governor, yet which expose Virginians to a much higher degree of social interaction than indoor shooting ranges.

28.  Forcing the closure of indoor shooting ranges has a consequence well beyond the economic losses of these ranges and the loss of jobs of its employees.  Forcing these ranges to close deprives the individual plaintiffs and the members of the organizational plaintiffs of access

9

to practice their constitutionally protected skills.  Outdoor ranges are no substitute for indoor ranges, and as the U.S. Supreme Court has ruled, the availability of alternatives does not make the violation of a constitutional right any more palatable.

29.  The closing of these ranges also defies and undermines the determination by the U.S. Department of Homeland Security that gun ranges are part of the Essential Critical Infrastructure of the nation.

30.  Significantly, the Governor appears to have recognized some limitation on his authority in that did he not close gun stores in Virginia.  Nevertheless, the camel's nose has entered the tent.  It would be dangerous in the extreme to allow the Governor to chip away at firearms-related rights incrementally with his closure of indoor shooting ranges.  If this action is allowed this year, an exceedingly dangerous precedent would be established which could be relied on by this or a subsequent Governor in a future emergency to order the closure of outdoor gun ranges, or even close all gun stores with the stroke of his pen.

## ARGUMENT

### I.  STANDARD FOR GRANTING TEMPORARY INJUNCTION.

31.  In granting a temporary injunction, the Court must look to the following criteria:  (1) the likelihood of success on the merits; (2) whether the plaintiffs are likely to suffer irreparable harm if the injunction is not granted; (3) whether the balance of equities tips in plaintiffs' favor; and (4) a showing that the injunction would not be adverse to the public interest.  *See The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009) (applying the test set forth in *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008)).  *See also McEachin v. Bolling*, 84 Va. Cir. 76, 77 (Richmond Cir. Ct. 2011).

10

32.  Virginia courts have widely adopted the *Real Truth* analysis in the absence of any specific elemental test from the Supreme Court of Virginia or applicable statutes.  *See, e.g., BWX Techs., Inc. v. Glenn*, 2013 Va. Cir. LEXIS 213 (Lynchburg Cir. Ct. 2013); *McEachin* at 77.  *See also CPM Va., L.L.C. v. MJM Golf, L.L.C.*, 94 Va. Cir. 404, 405 (Chesapeake Cir. Ct. 2016) (listing several Virginia Circuit Courts which have used the federal four-part test).

33.  The basis for a declaratory judgment and the reasons for issuance of a temporary injunction showing likelihood of success on the merits is addressed in sections II-VI, *infra*.

## II.  EO 53 CONSTITUTES AN *ULTRA VIRES* ACT OF THE GOVERNOR, IN VIOLATION OF VIRGINIA'S EMERGENCY SERVICES AND DISASTER LAW.

34.  To Plaintiffs' knowledge, never before in the history of the Commonwealth has any Governor — and there have been 72 before the current occupant of that office — claimed to have the extraordinary and unilateral authority to, with the stroke of a pen, and without action by the General Assembly, close entire categories of businesses throughout the entire Commonwealth.[1] Deeply embedded in the Virginia legal tradition is "a cautious and incremental approach to any expansions of the executive power."  *Gallagher v. Commonwealth*, 284 Va. 444, 451, 732 S.E.2d 22, 25 (2012).  This tradition reflects our Commonwealth's belief that the "concerns motivating the original framers in 1776 still survive in Virginia," including their skeptical view of "the unfettered exercise of executive power."  *Id*.  No authority exists anywhere in the laws

---

[1]  To be sure, the City of Richmond is reported to have implemented certain public measures in response to the Spanish Flu a century ago.  *See* Addeane S. Caelleigh, "The Influenza Pandemic in Virginia (1918-1919)," *Encyclopedia Virginia*.

11

of the Commonwealth that would permit the Governor to simply decide to close all "indoor shooting ranges," as he has done.

35.   The text of EO 53 sets forth two bases of purported authority for the Governor to completely shutter a broad variety of lawful businesses in Virginia:  Article V, Section 7 of the Constitution of Virginia, and Va. Code § 44.1-146.17, which is part of the "Emergency Services and Disaster Law" within the Code of Virginia.  Yet even an expansive and deferential reading of these provisions would not support the Governor's actions, and as discussed, *infra*, other Executive Orders have been struck down by Virginia Courts in the past.

**A.  Article V, Section 7, Virginia Constitution.**

36.   Article V, Section 7 of the Constitution of Virginia simply contains no language or provision which could possibly be construed to empower the Governor to completely close an entire category of lawful businesses, let alone one which implicates, and directly provides for the exercise of, a constitutional right.

37.     The full text of Article V, Section 7 is as follows:

The Governor shall take care that the laws be faithfully executed.

The Governor shall be commander-in-chief of the armed forces of the Commonwealth and shall have power to embody such forces to repel invasion, suppress insurrection, and enforce the execution of the laws.

The Governor shall conduct, either in person or in such manner as shall be prescribed by law, all intercourse with other and foreign states.

The Governor shall have power to fill vacancies in all offices of the Commonwealth for the filling of which the Constitution and laws make no other provision. If such office be one filled by the election of the people, the appointee shall hold office until the next general election, and thereafter until his successor qualifies, according to law. The General Assembly shall, if it is in session, fill vacancies in all offices which are filled by election by that body.

12

> Gubernatorial appointments to fill vacancies in offices which are filled by
> election by the General Assembly or by appointment by the Governor which is
> subject to confirmation by the Senate or the General Assembly, made during the
> recess of the General Assembly, shall expire at the end of thirty days after the
> commencement of the next session of the General Assembly.

38.  The Governor cannot rely on a constitutional provision for authority to issue an

executive order on a subject that bears no relation whatsoever to the limited grant of executive

power in the constitutional provision.  Nor can this Court, regardless of any "policy"

argument that the Commonwealth may raise, bend the language of a constitutional provision to

mean something different from, or greater than, the text.  In construing constitutional

provisions, the Court is "not permitted to speculate on what the framers of [a] section might

have meant to say, but are, of necessity, controlled by what they did say." *Harrison v. Day,*

200 Va. 439, 448, 106 S.E.2d 636, 644 (1959).  If there are "no doubtful or ambiguous words

or terms used, we are limited to the language of the section itself and are not at liberty to

search for meaning, intent or purpose beyond the instrument." *Id*.  *See also Blount v. Clarke*,

291 Va. 198, 782 S.E.2d 152 (2016).

39.  In this instance, Article V, Section 7 provides no executive authority to engage in

the complete closure of constitutionally protected indoor shooting ranges or, indeed, closure of

any of the otherwise lawful categories of businesses affected.  EO 53 is plainly *ultra vires* to

the extent that it purports to rely on Article V, Section 7 of the Constitution of Virginia.

**B.  Virginia Emergency Services and Disaster Law.**

40.  The second source of purported authority for EO 53 is Va. Code § 44.1-146.17,

which enumerates a specific and limited list of powers that the Governor has in relation to a

declaration of emergency.  This Code section includes powers such as ordering evacuations of

13

areas stricken or threatened by natural disasters, and issuing orders to control and allocate

essential goods such as food and fuel.  As is true with respect to Article V, Section 7, there is

no provision within Va. Code § 44.1-146.17 that could possibly be construed as empowering

the Governor to close entire categories of businesses throughout the entire Commonwealth.  It

is simply not a power granted or even contemplated by the Emergency Services and Disaster

Law.

     41.  With regard to firearms and shooting ranges in particular, in 2012, the General

Assembly also enacted the current version of Va. Code § 44-146.15(3), which provides in

relevant part as follows:

> Nothing in this chapter is to be construed to:
>
> (3) Empower the Governor, any political subdivision, or any other
> governmental authority to in any way limit or prohibit the rights of the people to
> keep and bear arms as guaranteed by Article I, Section 13 of the Constitution of
> Virginia or the Second Amendment of the Constitution of the United States,
> **including the otherwise lawful possession, carrying, transportation, sale, or
> transfer of firearms** except to the extent necessary to ensure public safety in
> any place or facility designated or used by the Governor, any political
> subdivision of the Commonwealth, or any other governmental entity as an
> emergency shelter or for the purpose of sheltering persons; ...  [Emphasis
> added.]

     42.  Inexplicably, in February of 2012, both Governor Northam and Attorney General

Mark Herring, then state senators, voted in favor of H.B. 20, the current version of the statute

that the Governor's Executive Order now subverts.

     43.  This 2012 amendment to the Emergency Services and Disaster Law was specifically

intended to prevent the Governor from using executive authority under a declaration of

emergency to infringe upon the right to keep and bear arms held by Virginians.  As discussed in

14

detail *infr*a, shooting ranges (and the ability to use them) are protected by the right to keep and

bear arms.  As it pertains to shooting ranges, EO 53 directly violates an express statutory

limitation on the Governor's emergency powers, in addition to being *ultra vires* for the more

general reasons set forth above.

### C.  Article I, Section 7 of the Virginia Constitution – Anti-Suppression Provision.

44.  Article I, Section 7 of the Constitution of Virginia provides:  "That all power of

suspending laws, or the execution of laws, by any authority, without consent of the

representatives of the people, is injurious to their rights, and ought not to be exercised."  This

provision of the Virginia Constitution has been applied recently by the Supreme Court of

Virginia in 2016 to strike down as unconstitutional a similarly sweeping Executive Order by

then-Governor Terry McAuliffe.  *Howell v. McAuliffe,* 292 Va. 320, 788 S.E.2d 706 (2016).

45.  In *Howell*, the Supreme Court of Virginia examined an executive order which

purported to restore, in a blanket and non-individualized manner, the voting rights of 206,000

Virginians who had been convicted of felonies but had completed their sentences.  Similar to the

present case, the *Howell* case pitted a clear provision of the Virginia Constitution (Article II, § 1,

which provides that no person convicted of a felony shall be eligible to vote unless his right to do

so be restored by the Governor) against a limited grant of executive power (Article V, § 12,

which gives the Governor specific powers to grant clemency).  Historically, the power of the

Governor to restore voting rights had always been understood to be limited to a case-by-case

basis and had been exercised on an individual basis.

46.  The Court made clear in *Howell* that any assertion by a Governor of absolute power

to issue executive orders "runs afoul of the separation-of-powers principle protected by Article I,

15

§ 7 of the Constitution of Virginia." *Id.* at 344.  As discussed in *Howell*, the very purpose of this provision was to prevent a Governor from becoming a King who could simply cast aside any restraints on his power, or rewrite laws that he found inconvenient to his policy goals.  There, the Supreme Court held that "[t]he unprecedented scope, magnitude, and categorical nature of Governor McAuliffe's Executive Order crosses that forbidden line." *Id.* at 349.

47.  This case presents an equally sweeping Executive Order of similarly unprecedented scope, magnitude, and categorical nature.  The gulf between the Governor's actual authority and the directives of EO 53 are much greater than those in the *Howell* case.  In the present case, the directive of EO 53 to categorically and completely close every single indoor shooting range in the entire state directly implicates and infringes on constitutionally protected rights of thousands of Virginians, yet — unlike *Howell* — there is no provision in the Constitution or Code of Virginia that would even *arguably* give the Governor such power.  It is simply a bare and unsupported directive that directly violates the core protection and purpose of Article I, § 7.

## III.    THE EXECUTIVE ORDER VIOLATES RIGHTS PROTECTED BY ARTICLE I, SECTION 13 OF THE VIRGINIA CONSTITUTION.

48.  EO 53 significantly restricts and burdens the exercise of, and therefore violates, the pre-existing right recognized and protected by Article I, § 13 of the Virginia Constitution, which states, in pertinent part:

> [t]hat a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defense of a free state, therefore, the right of the people to keep and bear arms shall not be infringed….[2]

_____

[2]  The first clause of Article I, § 13 is original to the 1776 Virginia Declaration of Rights, while the second clause was added in 1971, adopting language drawn directly from the Second Amendment of the U.S. Constitution which had been ratified by the States 180 years

16

The Second Amendment to the U.S. Constitution similarly states that:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

The 1968 Virginia Commission on Constitutional Revision[3] stated:

> [t]hat most of the provisions of the Virginia Bill of Rights have their parallel in the Federal Bill of Rights is … no good reason not to look first to Virginia's Constitution for the safeguards of the fundamental rights of Virginians.  The Commission believes that the Virginia Bill of Rights should be a living and operating instrument of government and should, by stating **the basic safeguards of the people's liberties**, minimize the occasion for Virginians to resort to the Federal Constitution and the federal courts.  [*Report of the Commission on Constitutional Revision*, p. 86 (1969) (emphasis added).]

*See also Richmond Newspapers, Inc. v. Com.*, 222 Va. 574, 281 S.E.2d 915 (1981).

49.   Although the prefatory clauses of the federal and Virginia constitutional provisions differ somewhat, these two protections of the right to keep and bear arms generally have been viewed as having the same scope and meaning.  A January 13, 1993 Virginia Attorney General legal opinion concluded that it is "clear that the 'right to bear arms' language of Article I, § 13 … tracks the Second Amendment … and … judicial interpretation of the Second Amendment thus applies equally to Article I, § 13."  1993 Report of the Attorney General at 16 (Jan. 13, 1993).  Likewise, the Supreme Court of Virginia has more recently noted that "provisions of the Constitution of Virginia that are substantively similar to those in the United States

---

earlier.

[3] The Virginia General Assembly passed a joint resolution in 1968 which created a Commission to study and recommend changes to the Virginia Constitution in the wake of the Civil Rights movement.  The recommendations led to the overwhelming passage of numerous modifications to the Virginia Constitution, including the explicit language added to Article I, Section 13.

17

Constitution will be afforded the same meaning," and concluded that the state provision "is coextensive with the rights provided by the Second Amendment … concerning all issues in the instant case." *Digiacinto v. Rector & Visitors of George Mason Univ.*, 281 Va. 127, 134, 704 S.E.2d 365, 369 (2011). Certainly, the rights of Virginians can be no less expansive than under the Second Amendment to the United States Constitution. *See McDonald v. City of Chicago*, 561 U.S. 742 (2010).

## IV.   THE CLOSURE OF SHOOTING RANGES VIOLATES RIGHTS OF VIRGINIANS RECOGNIZED AND PROTECTED BY THE SECOND AMENDMENT.

50. In addition to violating Article I, § 13 of the Virginia Constitution, EO 53 violates the Second Amendment to the United States Constitution, which reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." It has been well established that the right to keep and bear arms protects activities associated with that right — including the right to access shooting ranges to gain and maintain proficiency in using firearms.

51. Until this year, the Commonwealth has long given proper respect to the right to keep and bear arms, which has led to very few constitutional challenges to firearms laws, and thus, very little case law in the Virginia courts. As a noted Second Amendment scholar explained, "[w]here a constitutional right is respected by the legislature, it would seem to be a virtue that few judicial decisions are necessary."[4]

---

[4] S. Halbrook, "The Right to Bear Arms in the Virginia Constitution and the Second Amendment: Historical Development and Precedent in Virginia and the Fourth Circuit," LIBERTY UNIV. L. REV. Vol. 8, Issue 3 at 646 (Oct. 2014).

18

52.  By contrast to Virginia, there have been many Second Amendment challenges to state and federal laws elsewhere around the nation due to the many laws, both new and old, affecting access to firearms.  This has led to the U.S. Supreme Court recognizing that the Second Amendment protects each individual citizen's right to keep and bear arms.  *See District of Columbia v. Heller*, 554 U.S. 570 (2008).  Shortly after *Heller*, the Supreme Court held that the Second Amendment is made applicable to the states under the Fourteenth Amendment.  *See McDonald v. Chicago*, 561 U.S. 742 (2010).  Thus, the Second Amendment operates as a limitation on Governor Northam's Executive Order 53.

53.  To counsel's knowledge, only two federal circuits have considered the application of the Second Amendment to restrictions on shooting ranges.[5]  In the first of a pair cases in the U.S. Court of Appeals for the Seventh Circuit, that court struck down an outright prohibition on all shooting ranges in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("*Ezell I*").  In determining whether the Second Amendment — which, by its terms, applies to keeping and bearing arms — the court held that "[t]he right to possess firearms for protection implies a corresponding right to acquire and **maintain proficiency** in their use; the core right [to keep arms in the home for defense of self and family] wouldn't mean much without the **training and practice** that make it effective." *Ezell I* at 704 (emphasis added).  *Ezell I* also cited to *Heller*, which quoted Professor Thomas Cooley's treatise saying:  "[T]o bear arms implies something

---

[5] The two-step test used in subsequent Second Amendment cases by certain federal courts has not been adopted by Virginia courts.  *See Digiacinto* at 136; *Prekker v. Commonwealth*, 66 Va. App. 103, 116-17, 782 S.E.2d 604, 610 (Ct. App. Va. 2016).

19

more than the mere keeping; it implies the learning to handle and use them…." *See Ezell I* at 704 (quoting *Heller* at 616-18).

54.   After *Ezell I*, the City of Chicago enacted an ordinance that allowed shooting ranges within the city, but were so severely restrictive that only 2.2 percent of the land in the city was not prohibited from having a shooting range, and virtually none of that was suitable for such a purpose.  *See Ezell v. City of Chicago*, 846 F.3d 888, 894 (7th Cir. 2017) ("*Ezell II*").  The Seventh Circuit likewise struck down the new zoning restrictions as violating the Second Amendment.

55.   The only other federal Court of Appeals of which counsel are aware which addressed shooting ranges upheld a New York City ordinance restricting transportation of licensed firearms only to those shooting ranges within the city.  The Second Circuit distinguished the absolute prohibition of shooting ranges that was at issue in *Ezell I* but, significantly, assumed "that the ability to obtain firearms training and engage in firearm practice is sufficiently close to core Second Amendment concerns that regulations that sharply restrict that ability to obtain such training could impose substantial burdens on core Second Amendment rights."  *New York State Rifle & Pistol Association v. New York City*, 883 F.3d 45, 58 (2d Cir. 2018).  Significantly, the Second Circuit recognized the reality that "[p]ossession of firearms without adequate training and skill does nothing to protect, and much to endanger, the gun owner, his or her family, and the general public."  *Id*.  That case is now before the U.S. Supreme Court on the merits, having been argued before the Court on December 2, 2019.

20

56.  Here, Governor Northam has expressly ordered the closure of all public "indoor shooting ranges" — listing them among other businesses that are broadly summarized as "places of indoor public amusement."  EO 53, Section 4.  Classifying shooting ranges as places of "public amusement" is entirely arbitrary and capricious, and fails to consider that safety measures, such as social distancing, can be implemented without infringing Second Amendment rights.  Indeed, as the Supreme Court said, "[t]he very enumeration of the right takes out of the hands of government … the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."  *Heller* at 634.

57.  The Governor's actions deprive Plaintiffs of the right to engage in a broad category of constitutionally protected activity for which there is no substitute.  Outdoor ranges are generally membership-based, many with waiting lists, and can be many miles distant from persons wanting to use them.  By ordering indoor shooting ranges closed, individuals are prevented from being able to hone their skills and proficiency in order to bear arms safely, efficiently, and effectively, should the need arise.  *See* Affidavit of Mitchell Tyler, ¶ 12.

## V.   THE DECLARATION OF AN EMERGENCY DOES NOT GIVE THE GOVERNMENT THE AUTHORITY TO SUSPEND CONSTITUTIONALLY PROTECTED RIGHTS.

58.  The U.S. Constitution does not provide for suspension of the Bill of Rights during an emergency.  As Justice Robert Jackson explained in a leading case circumscribing executive power:

> The appeal, however, that we declare the existence of inherent powers *ex necessitate* to meet an emergency asks us to do what many think would be wise, although it is something the forefathers omitted.  **They knew what emergencies were**, knew the pressures they engender for authoritative action, knew, too, **how**

21

**they afford a ready pretext for usurpation**.  We may also suspect that they suspected that emergency powers would tend to kindle emergencies.  Aside from suspension of the privilege of the writ of habeas corpus in time of rebellion or invasion, when the public safety may require it, **they made no express provision for exercise of extraordinary authority because of a crisis**.[6]  I do not think we rightfully may so amend their work, and, if we could, I am not convinced it would be wise to do so, although many modern nations have forthrightly recognized that war and economic crises may upset the normal balance between liberty and authority.  [*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 649-50 (1952) (Jackson, J., concurring) (emphasis added).]

59.  Justice Jackson's opinion is highly persuasive as it was written shortly after he served as Chief Prosecutor of the Nuremberg Trials, studying what had happened in Germany under the Weimar Constitution, which expressly empowered the President of the German Republic "to suspend any or all individual rights if public safety and order were seriously disturbed or endangered."[7]  *Id.* at 651.  After the burning of the Reichstag in 1933, German President Hindenburg used that power to suspend most civil liberties in Germany, and those rights were not reinstated until after World War II.  *See id.*

---

[6]  Pandemics were a well-known phenomenon at the time of the writing and ratification of the Constitution.  *See, e.g.,* H. Schenawolf, "Diseases and Epidemics During Revolutionary America 1763-1783," *Revolutionary War Journal* (Aug. 8, 2014); "Pandemics That Changed History," *History*.com (Apr. 1, 2020).

[7]  Justice Jackson is remembered for his dissent from what has been recognized as one of the worst Supreme Court decisions to have been issued:  *Korematsu v. United States*, 323 U.S. 214 (1944) ("[I]f we cannot confine military expedients [or emergencies] by the Constitution, neither would I distort the Constitution to approve all that the military [or emergency orders] may deem expedient."  *Id.* at 244 (Jackson, J., dissenting).).  The Supreme Court's authorization of the detention of Japanese Americans was recently effectively overruled in an opinion by Chief Justice Roberts.  *See Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ("*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and — to be clear — 'has no place in law under the Constitution'" — quoting Justice Jackson's dissent in *Korematsu*).

22

60.  Governor Northam has no power to suspend civil liberties enumerated in and guaranteed by the Bill of Rights pursuant to his emergency powers.  This also includes the right to keep and bear arms, as well as any necessarily associated rights such as the ability to purchase firearms, ammunition, and accessories, and the ability to operate or have access to an indoor shooting range in order to gain or maintain proficiency in the exercise of the right to keep and bear arms.

61.  No constitutional provision or law authorizes Governor Northam to suspend the right to keep and bear arms.  While his Order did not close all gun stores — a decision that would have led to massive push-back — he did close indoor gun ranges — effectively a chipping away of Second Amendment rights.  This incremental attack must be rejected.[8]

62.  The Second Amendment clearly prohibits Governor Northam's closure of indoor shooting ranges, and no emergency can justify such a statewide ban.

---

[8]  Three courts have already issued injunctions against Alabama, Ohio, and Texas, preventing those states from using emergency powers to prevent abortions as elective medical procedures during the COVID-19 pandemic.  *See Robinson v. Marshall*, 2020 U.S. Dist. LEXIS 54767 (M.D. Ala., Mar. 30, 2020); *Planned Parenthood Center for Choice v. Abbott*, 2020 U.S. Dist. LEXIS 57365 (W.D. Tex., Mar. 30, 2020) (stayed by *In Re Abbott*, Fifth Circuit (No. 20-50264, Mar. 31, 2020)); and *Preterm-Cleveland v. Attorney General of Ohio*, Docket No. 19-cv-00360, Doc. No. 43 (S.D. Ohio, Mar. 30, 2020) (affirmed by the Sixth Circuit on Apr. 6, 2020).  It would make a mockery of the U.S. Constitution if courts were to enjoin other states' governors who have ordered the cessation of elective abortions (an unenumerated right which courts have granted elevated status), while permitting the suspension of the exercise of an expressly enumerated right.

23

## VI.   EO 53 WAS ISSUED BEFORE AND NOW IS INCONSISTENT WITH THE FEDERAL GOVERNMENT'S DESIGNATION OF SHOOTING RANGES AS ESSENTIAL CRITICAL INFRASTRUCTURE.

63.   On March 19, 2020, the Cybersecurity and Infrastructure Security Agency, a component of the U.S. Department of Homeland Security, issued guidance on 16 sectors of businesses that are considered "Essential Critical Infrastructure."[9]   In response to feedback, on March 28, 2020, CISA issued revised guidance, and included in the "Law Enforcement, Public Safety, and Other First Responders" sector is "Workers supporting the operation of firearm or ammunition product manufacturers, retailers, importers, distributors, and **shooting ranges**." (Emphasis added.)

64.   Although the CISA guidance is advisory in nature, its findings and conclusions provide significant support in the context of the pandemic, especially as the guidance was developed "in collaboration with other federal agencies, State and local governments, and the private sector." CISA Mar. 28 letter.  Furthermore, the purpose of the guidance is to help state and local governments "as they work to protect their communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security." *Id.*

65.   The revised CISA guidance recognized the importance of Second Amendment protected activity, which also serves an important defensive purpose, and was already recognized by many other states which issued states of emergency and stay at home orders. *See*, *e.g.*, Executive Order of Governor of Illinois, Executive Order in Response to COVID-19

---

[9]   https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19.

24

(COVID-19 Executive Order No. 8) at 12(n), (defining "Essential Businesses and Operations"
to include "firearm and ammunition suppliers and retailers for purposes of safety and
security").

66.   Some states which had previously closed gun stores and ranges under their orders
reversed course and adopted the revised guidance.  For example, on March 30, 2020, the
Governor of New Jersey classified gun stores as essential and allowed them to reopen, stating,
"[I]n accordance with the guidance released over the weekend by the federal Department of
Homeland Security, we will allow firearms retailers to operate."  N.J. Governor Phil Murphy,
Coronavirus Briefing Media (Mar. 30, 2020).

67.   The revision to the CISA guidance reflects the principles:  (i) of respect for the
Second Amendment and that rights that it guarantees should not be suspended during an
emergency; and (ii) that access to gun stores and ranges contribute to local and national
security, by providing the People with necessary means of self-defense and methods to become
proficient with those implements of self-defense.

68.   During an emergency, local law enforcement can be depleted, particularly during a
pandemic, by members of the forces becoming infected or needing to quarantine in order to
prevent potential spread of the virus.  Further, some incarcerated criminals are being released
to mitigate the spread of the virus.  And several municipalities have released directives to their
police that certain suspected criminals, who would be arrested under normal circumstances,
will only be cited and released, again due to the desire to reduce the transmission of the
pandemic.  All of these factors leave individual citizens more aware of their need to be

25

responsible for their own protection, and the CISA revised guidance is implicit

acknowledgment of that reality.

69.  While Governor Northam has followed the federal lead on COVID-19 issues, such

as wearing face masks,[10] and has requested and accepted help from the federal government

related to the pandemic,[11] and while some Virginia agencies are working closely with federal

agencies on important research related to the COVID-19 virus,[12] he has refused to follow the

federal government's guidance on this critical issue of Essential Critical Infrastructure.

## VII.   THE OTHER TEMPORARY INJUNCTION FACTORS WEIGH IN FAVOR OF GRANTING AN INJUNCTION.

70.  Plaintiffs have addressed likelihood of success on the merits in the sections *supra*.  In

this section, they address the remaining three elements for issuance of a temporary injunction.

### A.    The Plaintiffs Are Likely to Suffer Irreparable Harm If the Injunction Is Not Granted.

71.  Several types of irreparable harm will be suffered in the absence of injunctive relief.

First, the indoor shooting range plaintiffs, which are required to be closed under EO 53, have

been rendered unable to fulfill their duties under contracts with their members to provide open

---

[10]  *See* D. Belt, "VA Residents Should Wear Face Masks: Gov. Northam, CDC," *Patch* (Apr. 3. 2020).

[11]  *See* Governor Northam press release (Apr. 2, 2020) ("'We thank the federal government for moving quickly to approve Virginia's request for a Major Disaster Declaration,' said Governor Northam. 'This critical funding will support our ongoing, statewide efforts to fight this virus in our Commonwealth and keep Virginians safe.'").

[12]  *See* Governor Northam press release (Apr. 6, 2020) (announcing Virginia's Division of Consolidated Laboratory Services is working with the CDC).

26

ranges and are unable to provide access to the general public during operating hours.  It would be exceedingly difficult to calculate the monetary harm suffered by the ranges and their employees.

72.  Many persons seeking Second Amendment-related goods and services in recent days have been new gun owners and novice shooters, who have not previously owned a firearm or visited a shooting range, and whose business the ranges may not be able to obtain in the future. Moreover, even if a claim for that lost revenue to the range and lost income to the employees were made, the state could and certainly would assert sovereign immunity, resulting in there being no adequate remedy at law.

73.  The current shutdown order extends to April 23, 2020, and could be extended.  All ranges are being irreparably harmed.  Should the shutdown continue, at least some ranges may be so financially crippled that they could be forced to shut down permanently, unable to reopen at all by the time the shutdown order is lifted.  Additionally, the range plaintiffs are being irreparably harmed in that they are unable to fulfill their mission to provide Second Amendment teaching, training, and shooting services to their members and the public.

74.  Second, the customers of the ranges, at least some of whom are members of GOA and/or VCDL, are being irreparably harmed in that they are unable to fully exercise their Second Amendment rights due to their inability to use these ranges to learn, practice, and hone their shooting skills.  Government statistics bear out the recent high demand for firearms.

> The Virginia Firearms Transaction Center recorded 80,228 transactions in March
> — a 75% jump over March 2019 and the highest total for any month on record
> since state police began tracking the data in 1990....  [M. Bowes, "Va. gun sales
> soar to new monthly record in March, topping 80,000 amid COVID-19 fears,"
> *Richmond Times-Dispatch*, Apr. 6, 2020.]

27

The Virginia experience is not unique, as the nation perceives the threat from COVID-19:

> The FBI says the National Instant Criminal Background Check System conducted 3.7 million screenings in March, the highest number recorded since its inception in 1998. The previous single-month record was 3.3 million in December 2015. [*Id*.]

75.   Persons who recently purchased their first firearm for self-defense purposes during the current pandemic are particularly harmed.  Should the lack of training and range time result in the inability of a gun owner to properly defend himself from burglaries, robberies, home invasions, rapes, murders, and other crimes, and otherwise to become a victim of crimes, such harm could not be resolved by monetary award.

76.   Also, range customers seeking licenses for concealed carry are being deprived of the ability to receive training.  Some ranges do not certify persons for concealed carry without range time, thereby depriving those individuals of the ability to be able to obtain a permit.

77.   Finally, individuals already well familiar with firearms will lose the use of their firearms if they are not able to practice with them at indoor shooting ranges and have no other reasonable alternatives available to them.  Even experienced individuals will lose some proficiency if they are not able to maintain some training, and new purchasers of firearms will not be able to gain experience when they need it most, as police forces are stressed by the pandemic.  This, too, is an irreparable violation of Second Amendment rights — it is always irreparable harm to be deprived of the exercise of a constitutionally protected right.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (the loss of a constitutionally protected right, "for even minimal periods of time, unquestionably constitutes irreparable injury").

28

**B.      The Balance of Equities Favor Plaintiffs.**

78.   The balance of equities in this case could be analyzed by weighing an impossible-to-estimate risk of transmission of flu-like "Coronavirus Disease 2019," abbreviated as "COVID-19," with as-of-yet unclear transmission rates and serious health consequences, against the definite, concrete, and irreparable harm that will be suffered by Plaintiffs, as discussed *supra*. The risk of COVID-19 to Virginians cannot be fully known but, during recent months, various public health officials have routinely overestimated the infectiousness, morbidity, and mortality from COVID-19, as shown by recent reassessments.  *See* A. Heymann, "Virginia's peak coronavirus prediction moved from May to April," *WRIC (*Apr. 6, 2020) ("The Institute for Health Metric and Evaluation has moved the Virginia"s [sic] peak outbreak of COVID-19 from late May to late April.").  *See*, *e.g.*, N. Arama, "Good News: IHME Revise Their Numbers Down as to Deaths, Hospitalizations, Bed, and Ventilator Need," *RedState* (Apr. 6, 2020).  *See also* S. Doughton "New UW analysis lowers coronavirus death projections and suggests hospitalizations may have already peaked in Washington," *The Seattle Times* (Apr. 6, 2020) ("After a 'massive infusion of new data,' modelers at the University of Washington are painting a much more optimistic picture of the novel coronavirus epidemic in the state, revising sharply downward their estimate of how many people are likely to die and suggesting Washington may have already passed the peak of hospitalizations.").

79.   Whatever the risk of transmission may be, it is worth noting that such risk would be borne primarily by persons who choose to accept that risk — customers of ranges and employees of ranges.  Indeed, every time a person goes to a food store to make a purchase, or goes to work

29

at that person's place of business which is allowed to be open, one assumes some risk of being

exposed to COVID-19, but that is no reason to close food stores or all businesses — and the

Governor, in his order, agrees.  The Governor's EO 53 has allowed most businesses in Virginia

to remain open.  Indeed, only a short list of businesses have been closed.

- Theaters, performing arts centers, concert venues, museums, and other
  indoor entertainment centers;
- Fitness centers, gymnasiums, recreation centers, indoor sports facilities,
  and indoor exercise facilities;
- Beauty salons, barbershops, spas, massage parlors, tanning salons, tattoo shops,
  and any other location where personal care or personal grooming services are
  performed that would not allow compliance with social distancing guidelines to
  remain six feet apart;
- Racetracks and historic horse racing facilities; and
- Bowling alleys, skating rinks, arcades, amusement parks, trampoline
  parks, fairs, arts and craft facilities, aquariums, zoos, escape rooms, **indoor
  shooting ranges**, public and private social clubs, and all other places of
  indoor public amusement.  [Emphasis added.]

Thus, only a tiny fraction of the state's businesses have been shut down — and there is no

compelling or even persuasive reason to include "indoor shooting ranges" on that list.

80.  Lastly, Section 9 of EO 53 provides that "Nothing in the Order shall limit ... (d) law

enforcement agencies; or (e) the operation of government."  Therefore, no one associated with

the federal, state, or local government is being barred from using indoor shooting ranges, despite

the threat of COVID-19, including those armed persons who guard Governor Northam.  Thus,

while everyone in government may use indoor shooting ranges at any time for any reason, all

other members of "the People" who pay taxes to the Commonwealth, and who constituted the

30

government through the Virginia and United States Constitutions, may **not** use those ranges at any time for any reason.

81.   When compared with all the businesses allowed to remain open, listing "indoor shooting ranges" on the banned list is particularly telling.  The Governor singles out indoor shooting ranges as if they presented some particular type of risk.  They do not.  Indeed, as explained in the Affidavit of Mitchell Tyler, these ranges actually provide an environment that reduces the risk of transmission of disease, as they are designed to draw airflow away from all shooters before being filtered.  If allowed to reopen, operators of those ranges would be subject to the mitigation measures mandated by EO 53, and individual ranges not following those measures could be subject to closure on a case-by-case basis on a finding of noncompliance.  Thus, rather than ordering all indoor ranges in the Commonwealth to close, it is more equitable, and far more logical, to recognize shooting ranges as essential infrastructure protected by a constitutional guarantee, allowing them to remain open.  There is no adequate remedy other than to issue an injunction prohibiting the Governor from closing all indoor shooting ranges.

**C.     The Injunction Would Not Be Adverse to the Public Interest**.

82.   Clearly, the public interest favors the protection of constitutional liberties from being abridged.  It is always in the public interest for the Governor to follow the law, and not to deprive citizens of their constitutionally protected right to keep and bear arms.

83.   Although the EO 53 was issued to protect the public interest and health, it arbitrarily and capriciously miscategorizes shooting ranges as places of "public amusement," even though they have very few similarities to the other places listed there and serve a purpose far more

31

significant than mere amusement.  The EO specifies mitigation measures that must be undertaken by those businesses which are allowed to remain open, and shooting ranges could follow those measures, as specified by the EO and directions from the CDC, thus protecting the public interest.  Further, and to the point of the Second Amendment, individuals should be able to gain proficiency with firearms in order to have effective self-defense with them, and this would be in the public interest as law enforcement may become hampered by the virus, delaying responses to crimes as they are being committed.

84.  The U.S. Department of Homeland Security, part of the same U.S. Government as the CDC, has declared shooting ranges to be part of the nation's Essential Critical Infrastructure Workforce.  If it were in the public interest to close these ranges, doubtless, the U.S. Department of Homeland Security would not have put gun ranges on their list of essential businesses.

85.  Lastly, the Governor's EO 53 conflicts with the reasoned judgment of nearly all other states that have issued similar emergency declarations and stay-at-home orders.  For example, the anti-gun group "The Trace" (updated as of April 6, 2020 at 10:12am)[13] reports that only four states have ordered any sort of Second Amendment-related businesses to be closed.  Meanwhile, at least 37 states have permitted Second Amendment businesses to remain open.  Many of these have simply adopted DHS' March 28, 2020 CISA list.  *See, e.g.*, Florida, Georgia, Missouri, New Jersey, and Texas.  Others widely permit any business to remain open so long as it follows social distancing guidelines.  *See, e.g.*, Alaska, North Carolina, and Oregon.  Lastly, the vast majority of states' orders explicitly state that Second Amendment

---

[13]  https://www.thetrace.org/2020/03/coronavirus-gun-store-closures-state-map/ .

32

businesses may remain open. *See, e.g.*, Alabama, Colorado, Connecticut, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Minnesota, Mississippi, Montana, New Hampshire, Ohio, Rhode Island, Tennessee, Vermont, West Virginia, and Wisconsin.  Even Los Angeles County Sheriff Alex Villanueva, "who has attempted to shut down gun stores in LA County twice, confirmed the development in a statement posted to Twitter" that gun stores could remain open, "citing 'further input from the federal government.'"[14]  If the public interest truly favored the closing of indoor shooting ranges, it would have been noticed by governors of other states.

## VIII.   A WRIT OF MANDAMUS SHOULD ISSUE TO REQUIRE DEFENDANTS TO CEASE AND DESIST FROM ENFORCING THE GOVERNOR'S BAN ON INDOOR SHOOTING RANGES, AND FOR THE GOVERNOR TO NOTIFY THE PUBLIC OF THE RESCISSION OF THE APPLICATION TO GUN RANGES.

86.  Plaintiffs petition for and seek issuance of a writ of mandamus, with payment of costs as permitted by Va. Code § 8.01-648 directing that, because EO 53 is unconstitutional and otherwise *ultra vires* with respect to its total closure of indoor ranges, the Governor provide notice to the residents of the Commonwealth of Virginia that "indoor gun ranges" are no longer shut down, and that no law enforcement department, division, agency, or officer in the Commonwealth has the discretion to enforce the provision of current EO 53 governing "indoor gun ranges."

87.  The Supreme Court of Virginia has consistently held that "[t]he writ of mandamus... only issues when there is a clear and specific legal right to be enforced, or a duty which ought to

---

[14]  B. Booker, "LA County Sheriff Will No Longer Order Closure Of Firearms Shops," *NPR* (Mar. 31, 2020).

33

be and can be performed, and where there is no other specific and adequate legal remedy." *Hertz v. Times-World Corp.*, 259 Va. 599, 608, 528 S.E.2d 458, 463 (2000) (quoting *Tyler v. Taylor*, 70 Va. (29 Gratt.) 765, 766-67 (1878)); *accord Town of Front Royal v. Front Royal and Warren County Indus. Park Corp.*, 248 Va. 581, 584, 449 S.E.2d 794, 796 (1994), *Hall v. Stuart*, 198 Va. 315, 323-24, 94 S.E.2d 284, 290 (1956).  Such a writ is appropriate where, as here, there is no adequate remedy at law.  *Cartwright v. Commonwealth Transp. Com'R*, 613 S.E.2d 449 (2005).  Issuance of a writ of mandamus will help remove the chilling effect of the Governor's EO 53 in having unlawfully prohibited the exercise of constitutionally protected rights by Virginians.

88.  The Supreme Court of Virginia has repeatedly indicated, including as recently as 2016, that mandamus is appropriate to remedy and enjoin enforcement of actions involving what were ultimately held to be unlawful executive acts.  *Howell v. McAuliffe*, 788 S.E. 2d. 706, 724 (2016) (issuing writ of mandamus effectively overturning an executive order, and stating that "[a]s a result of our holding that the Executive Orders are unconstitutional, no election official in the Commonwealth has the discretion to enforce them.").

## <u>RELIEF SOUGHT</u>

WHEREFORE, for the foregoing reasons, plaintiffs seek the following relief:

• A declaratory judgment finding that the provisions of Executive Order Number Fifty-Three issued by the Governor on March 23, 2020 which effect the complete closure of indoor shooting ranges are (a) *ultra vires* and beyond the scope of the Governor's executive authority, under the Constitution of Virginia, the Emergency Services and

34

Disaster Law (Va. Code § 44.1-146.13, *et seq.*), and otherwise; (b) violative of Article I, § 13 of the Constitution of Virginia (Right to Keep and Bear Arms); (c) violative of Article I, § 7 of the Constitution of Virginia (Anti-Suspension Provision); and (d) violative of the Second Amendment to the United States Constitution;

- Immediate entry of a temporary injunction, on an emergency basis and without bond, enjoining the Governor, the Department of State Police, and all law enforcement divisions, agencies, and officers within the Commonwealth, from enforcing, in any manner, the prohibition on public access to indoor shooting ranges as set forth in Paragraph 4 of Executive Order Number Fifty-Three issued by the Governor on March 23, 2020, provided that indoor shooting ranges shall operate in a manner consistent with Paragraph 7 of Executive Order Number Fifty-Three (*i.e.*, operate to the fullest extent possible in a manner consistent with social distancing and sanitizing guidance from federal and state authorities);

- Issuance of a writ of mandamus, with payment of costs as permitted by Va. Code § 8.01-648, directing that, because EO 53 is unconstitutional and otherwise *ultra vires* with respect to its total closure of indoor ranges, that the Governor provide notice to the residents of the Commonwealth of Virginia that the "indoor gun ranges" are no longer shut down, and that no law enforcement department, division, agency, or officer in the Commonwealth has the discretion to enforce the provision of current EO 53 governing "indoor gun ranges"; and

35

- Further relief pursuant to and in accordance with such declaratory judgment, to include permanent injunctive relief, plaintiffs' costs, and such other and further relief as the Court may deem appropriate.

Respectfully Submitted,
LYNCHBURG RANGE & TRAINING, LLC
VIRGINIA CITIZENS DEFENSE LEAGUE
GUN OWNERS OF AMERICA, INC.
ASSOCIATION OF VIRGINIA GUN RANGES

BY:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
COUNSEL

David G. Browne (VSB No. 65306)
Spiro & Browne, PLC
6802 Paragon Place, Suite 410
Richmond, VA 23230
Telephone: 804-573-9220
E-mail: dbrowne@sblawva.com

William J. Olson (VSB No. 15841)
Robert J. Olson (VSB No. 82488)
Herbert W. Titus (VSB No. 41126)
William J. Olson, P.C.
370 Maple Avenue, West, Suite 4
Vienna, Virginia 22180
Telephone: 703-356-5070
114 Creekside Lane
Winchester, Virginia 22602
Telephone: 540-450-8777
E-mail: wjo@mindspring.com

Counsel for Plaintiffs